Josef FISCHL, Plaintiff–Appellant,

v.

David ARMITAGE, Corrections Sergeant, and S.A. Marshall, Corrections Officer, in their individual capacities, Defendants–Appellees.

Nos. 1631, Docket 96–2852.

United States Court of Appeals, Second Circuit.

Argued June 3, 1997.

Decided Oct. 9, 1997.

Michael E. Cassidy, Plattsburgh, NY (Prisoners' Legal Services of New York, Plattsburgh, NY, on the brief), for Plaintiff–Appellant.

Gina M. Ciccone, Assistant Attorney General, Albany, NY (Dennis C. Vacco, Attorney General of the State of New York, Peter H. Schiff, Deputy Solicitor General, Nancy A. Spiegel, Assistant Attorney General, Albany, NY, on the brief), for Defendants–Appellees.

Before: NEWMAN, KEARSE, and CALABRESI, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Josef Fischl, formerly an inmate in New York State's Clinton Correctional Facility ("Clinton"), appeals from a final judgment of the United States District Court for the Northern District of New York, Daniel Scanlon, Jr., *Magistrate Judge*, dismissing his complaint, brought under 42 U.S.C. § 1983 (1994), alleging that defendants David Armitage and S.A. Marshall, correctional officers at Clinton, violated Fischl's right under the Eighth Amendment to the Constitution by causing or allowing other inmates to enter his prison cell and assault him. The magistrate judge granted summary judgment dismissing the complaint on the ground that Fischl had not produced sufficient evidence to create an issue to be tried as to the personal involvement of Armitage and Marshall in the assault. Fischl challenges this ruling on appeal, contending that the district court did not draw reasonable inferences in his favor. We agree, and we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

The events leading to the assault of which Fischl complains began in September 1991 on Clinton's "E–Block," an enclosed section of the prison reserved for "protective custody" inmates, *i.e.*, inmates who have been determined to need protection from other inmates. Fischl was housed on E–Block. Armitage and Marshall were corrections offi-

cials on duty in that area on the day of the assault.

Many of the facts as to prison operations are undisputed. The description of the events, including the assault and the statements allegedly made by Armitage and an assailant, is taken from deposition testimony given by Fischl in this action.

### A. The Configuration and Management of E–Block

E–Block was divided into seven "companies" of cells, each company comprising a row of some 20 cells along a corridor approximately 130 feet long. At one end of each company was a secured area known as the "officer's cage." The doors of the individual cells on each company could be opened only by means of controls on a panel in the officer's cage; the panel, as secured by a heavy sliding steel door that could be locked, was called a "lockbox." The practice was for both the lockbox and the cage to be locked up when no officer was in the officer's cage and the control panel was not in use.

The day-shift staff on E–Block consisted of a block sergeant, who had overall command of E–Block, and eight corrections officers. Six of the corrections officers held positions as "company officers"; the remaining two officers were not attached to any particular company but held general supervisory positions. The lockbox keys for all of the companies were interchangeable; thus, any company officer on E–Block would have been able to open another company's lockbox with his own set of keys and thereby gain access to that company's control panel.

On September 4, 1991, Armitage was the sergeant in charge of E–Block; he had held that position for some two years. Fischl had been housed on E–Block's "Four Company" since late August 1991. His cell was the 17th away from the officer's cage. Marshall was the officer in charge of Four Company; Marshall was not regularly assigned to E–Block, and September 4 was the only day he worked there. Armitage's duties took him throughout E–Block and the remainder of the prison; roughly half of his eight-hour shift was spent on or around the seven companies of E–Block. Marshall, as a company officer, was

required to spend much of his time in the officer's cage. From his position in the cage, Marshall had access to the control panel from which the Four Company cell doors could be opened.

### B. The Assault on Fischl and the Ensuing Threats

According to Fischl's deposition testimony, on the night of September 3, 1991, he had arranged to trade shampoo and soda in his possession for food from the prison store possessed by an inmate who was housed on Four Company several cells away from his. However, after Fischl passed his items to the inmate in the cell adjacent to his, he received nothing in return. Fischl reacted angrily to being cheated, and the other inmates laughed and jeered. Fischl proceeded to retaliate by stuffing the toilet in his cell with rags and flushing it repeatedly, thereby causing the area surrounding his and the other inmates' cells to be flooded. The water released from the toilet, which eventually spread throughout most of the company, had to be cleaned up that night by a group of inmates known as "porters," who performed custodial and other services in the prison.

On the morning of September 4, Armitage and Marshall arrived on E–Block to begin their 7:00 A.M. shift. They were informed by members of the previous shift that Fischl had flooded most of the Four Company area the night before. When Armitage went to inspect the area, which still contained debris from the flooding, inmates complained to him about the resulting water damage to their property. Armitage did not speak to Fischl, who was apparently sleeping.

Between 9:00 and 9:30 that morning, Fischl was assaulted in his cell by six inmates. He did not know the names of any of the six, but he recognized two, whom he knew by the nicknames "Motown" and "Playboy," as inmates assigned to Four Company cells near his, whose property may have been damaged as a result of Fischl's flooding maneuver. He recognized others, including one he knew by the nickname "Fuquan," as porters who performed tasks on E–Block such as cleaning up messes like the flood created by

Fischl the night before. Just prior to the assault, the door to Fischl's cell was opened—though from inside his cell Fischl could not see who operated the cell-door controls—and Fischl heard Fuquan say, "Sergeant says no steel. No steel. As far as weapon [*sic*], no steel. He said, We got ten minutes. The sergeant said we got ten minutes. No steel." (Deposition of Josef Fischl ("Fischl Dep.") at 26.)

The six inmates entered through the unlocked door and beat Fischl with a broom and with their fists and kicked him in the head and body for approximately 10 minutes. Although Fischl yelled during the attack, no one came to his aid. The attack ended only after two other inmate porters came to the door of Fischl's cell and told his assailants, "That's enough. Don't hit him no more. You're going to kill him." (*Id.* at 24.) The attackers then departed.

Following the attack, Fischl remained in his cell, bleeding profusely, for some 30–40 minutes, after which the company officer, Marshall, passed by. Fischl asked Marshall to get him medical attention. Such attention was not forthcoming until Fischl was taken to the prison hospital some two hours later. At that hospital and at a hospital outside the prison, to which Fischl was taken later, it was determined that in addition to multiple contusions and abrasions, Fischl had sustained three head-area fractures, to wit, a broken nose, a linear, nondisplaced fracture of the right zygomatic arch, and a blow-out fracture of the right eye socket.

Fischl remained in the prison hospital for two weeks. He testified that during that period, Armitage visited him twice to threaten and harass him, once accompanied by two of the inmates who had participated in the attack. During both visits, Armitage repeatedly threatened to kill Fischl, while making references to the September 4 assault, stating, *inter alia,* "This is Clinton. That's only the first step of the treatment. That's only the first step of the treatment, you know." (Fischl Dep. at 28.) Following Fischl's release from the hospital, the threats and harassment by Armitage allegedly continued. Fischl testified that whenever Armitage saw him when no one else was within

earshot, Armitage would threaten to kill him, warning him, "Don't press charges on us." (*Id.* at 28–29.)

## C. *Defendants' Motion for Summary Judgment; The Decision Below*

Fischl brought the present suit seeking compensatory and punitive damages, alleging that Armitage and Marshall had participated in or encouraged the assault by opening the door to Fischl's cell for the attacking inmates, or by permitting someone else to open it, in violation of Fischl's Eighth Amendment right to be free from cruel and unusual punishment. Armitage and Marshall filed answers denying that they had been involved in the attack in any way. By consent of the parties, the case proceeded before a magistrate judge, pursuant to 28 U.S.C. § 636(c) (1994).

Following extensive discovery, including the depositions of Fischl, Armitage, Marshall, and others, defendants moved for summary judgment, arguing that no evidence had been produced to show their personal involvement in the assault. In support of their motion, Armitage and Marshall submitted the various depositions, along with their affirmations stating, *inter alia,* that they did not know how Fischl had received his injuries. Marshall stated that his duties as company officer for Four Company on September 4 included letting inmates out of their cells, one at a time, to use the shower or the telephone during the morning hours. In addition, he frequently walked down the 130–foot length of the Four Company corridor to be sure that nothing was amiss. On those inspection trips, Marshall could not see the cell-door controls: "You cannot see the cell door controls unless you are in the control area or right outside it; in particular, you cannot see the controls if you have moved away from them down the cell block." (Reply Affirmation of Scott A. Marshall dated February 14, 1995, ¶ 4.) According to the logbook kept by Marshall, on the morning and early afternoon of September 4 he made inspection rounds at 7:30 a.m., 8:15 a.m., 9:17 a.m., 9:27 a.m., 10:00 a.m., 10:50 a.m., 11:27 a.m., 12:00 noon, and 12:30 p.m.

Defendants also filed a statement pursuant to Local Rule 7.1(f) detailing material facts they asserted were uncontested. They described, *inter alia,* instances after September 4, 1991, in which Fischl had inflicted superficial injuries on himself in an effort to receive preferential treatment. Defendants suggested that the injuries at issue here reflected such an instance. Fischl filed a responding statement pursuant to Rule 7.1(f), along with, *inter alia,* an affirmation from a physician who stated that Fischl's medical records showed multiple contusions and abrasions of the forehead, ears, neck, wrist, and ankle, in addition to the broken nose, the fracture of the zygomatic arch, and the blowout fracture in the eye socket. The physician opined that all of Fischl's injuries were "blunt force injuries"; that "[t]he force necessary for the blowout fracture and the fracture of the zygomatic arch is substantial indicating a deliberate delivery of hard blows to the area"; that the multiplicity of his injuries "removes them from the realm of being accidentally incurred"; and that the eye socket fracture was of such a magnitude that it was *"impossible"* that Fischl did it to himself, either accidentally or intentionally. (Affirmation of Isidore Mihalakis, M.D., dated March 13, 1994, ¶ 5 (emphasis in original).)

In an order dated September 26, 1996 ("Opinion"), the magistrate judge granted defendants' motion for summary judgment on the ground that there was insufficient evidence that either defendant had been personally involved in the alleged attack. In dismissing the claim against Marshall, the district court stated:

> Plaintiff claims defendant Marshall opened his cell door to the assailants. Defendant Marshall denies this charge, and swore he only knew of plaintiff's injuries long after the alleged assault, and played no part in the circumstances resulting in their infliction.
>
> Plaintiff's evidence regarding the opening of the cell door is presumptive. He admits that he could not see who opened the door from his cell, but assumes that defendant Marshall did it because he was the company officer and only he could have done so. This conclusion ignores the fact

that there were seven other correctional officers assigned to E block during the September 4, 1991 day shift and all had access to the cell door lock controls. Additionally, as the Four Company officer[ ], defendant Marshall's duties did not call for him to remain in a stationary position in the cell door control area throughout his work shift. He was required to make the rounds of the company several times and to make entries in the log book documenting events that occurred that day. While making these rounds, defendant Marshall could not observe the cell door control area. The Four Company log book for September 4, 1991 shows that he made the company rounds nine times that day including four rounds made before the alleged assault on plaintiff. There were also several correctional workers present at various times throughout the day shift. In view of this, it would be unreasonable to determine that defendant Marshall opened the cell door based on[ ][t]he single fact that he was the company officer on that date.

. . . .

Additional evidence in this case indicates that it should not be inferred that defendant Marshall opened the cell door. Indeed, this evidence includes plaintiff's inconsistent sworn statements about the details of the alleged assault and its results.

Opinion at 8–10. By "inconsistent sworn statements," the court referred to, *inter alia,* discrepancies in Fischl's assertions as to the number of inmates involved in the assault: the complaint alleged that Fischl had been attacked by five assailants; his deposition testimony was generally that he had been attacked by six; and at one point he testified that four people held him down while three others took turns kicking his face. *See id.* at 5. In addition, there was evidence that on the morning of September 4, Fischl had not reported the attack to Marshall or to various other prison workers who were on E–Block, *see id.* at 6; and evidence that prior to his deposition, Fischl had stated that he first became aware of the impending attack when his cell door opened and the inmates entered, and he had not mentioned hearing the preen-

try statement he now attributes to Fuquan, *see id.* at 5.

In dismissing the complaint against Armitage, the court noted, *inter alia,* Fischl's deposition testimony that Fuquan had said "sergeant says no steel" and "sergeant said we got ten minutes," but the court concluded that

> [t]his is hearsay evidence and is prohibited by the Federal Rules of Evidence, Section 801(c).... "Fuquan's" alleged hearsay statement may not be used to connect defendant Armitage to the purported assault nor in opposition to the summary judgment motion.
>
> Plaintiff further attempts to connect defendant Armitage to the alleged acts by claiming that he threatened him several times after the assault. This claim is without merit; first because mere allegations of verbal abuse, threats or defamations by a correctional officer to a prisoner are not cognizable in a Section 1983 action, *Hikel v. King,* 659 F.Supp. 337, 338 (E.D.N.Y. 1987), and second, there is no showing that any of the asserted threats were carried out.

Opinion at 11.

The magistrate judge concluded that Fischl had failed to "show[ ] purposeful acts on the part of the defendants or deliberate indifference to his safety." *Id.* at 11–12. Judgment dismissing the complaint was entered, and this appeal followed. For the reasons that follow, we vacate and remand for trial.

## II. DISCUSSION

The substantive principles are not in dispute. The Eighth Amendment proscribes the " 'unnecessary and wanton infliction of pain' " on prisoners by prison officials. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir. 1997) (quoting *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)). It also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (internal quotation marks omitted). A prisoner injured while in custody may recover for violation of his Eighth Amendment rights if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a "substantial risk of serious harm" or from the official's deliberate indifference to that risk. *Id.* at 834, 114 S.Ct. at 1977; *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996).

▮ In order to succeed on a claim for damages under 42 U.S.C. § 1983 for violation of his constitutional rights, the plaintiff must show by a preponderance of the evidence that the defendant was personally involved in the constitutional violation. *See, e.g., Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." 4 L. Sand *et al., Modern Federal Jury Instructions* ¶ 73.01, at 73–4 (1997); *see Larson v. Jo Ann Cab Corp.,* 209 F.2d 929, 935 (2d Cir.1954).

The pertinent principles governing consideration of a motion for summary judgment are also well established. In deciding such a motion, the court is required to view the evidence in the light most favorable to the party against whom summary judgment is sought and to draw all permissible inferences in favor of that party. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996); *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991). The court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Rule v. Brine, Inc.,* 85 F.3d at 1011. Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment. *See, e.g.,* Fed.R.Civ.P. 56(e) 1963 Advisory Committee Note; *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Weyant v. Okst,* 101 F.3d at 856; *Rule v.*

*Brine, Inc.,* 85 F.3d at 1011. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997).

## A. *The Dismissal of the Complaint Against Marshall*

■ The district court's dismissal of the complaint against Marshall did not comport with the above principles. First, the district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl. For purposes of ruling on the motion for summary judgment, Fischl's testimony that he was beaten by the inmates must be accepted as true. Further, his testimony that he was beaten was supported by photographs taken of him on the afternoon of September 4 showing severe bruises; by hospital records showing, *inter alia,* three fractures in the head area; and by the opinion of a physician that his injuries were blunt-force injuries consistent with his having been kicked and that the blowout fracture of Fischl's eye socket could not possibly have been self-inflicted. To suggest that there was no assault was surely to reject reasonable inferences favoring Fischl's case. Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

Second, the district court concluded that "it would be unreasonable to determine that defendant Marshall opened the cell door based on[ ][t]he single fact that he was the company officer on that date," in part because "seven other correctional officers" also had keys that could have opened the Four Company officer's cage and lockbox. Opinion at 9. This conclusion plainly is based on the drawing of inferences in favor of Marshall rather than in favor of Fischl. It is undisputed that inmates could not get into Fischl's cell unless someone opened the cell door for them, and that the cell door could be opened only from an area to which only corrections officers had access. The fact that corrections officers other that Marshall could have used their keys to enter the Four Company officer's cage is certainly a point that can be argued to the jury. But so far as we are aware, the record contains no evidence that any corrections officer other than Marshall was in the Four Company cage on the morning of September 4, and it is undisputed that on that morning, the manning of that cage was the sole responsibility of Marshall. It would surely be permissible for the jury to infer that the officer who opened Fischl's cell door or permitted it to be opened was the only officer who was then responsible for being in the Four Company officer's cage and who in fact was in that control area for most of the morning.

Further, to the extent that the court suggested that the possession of keys by other officers meant that Fischl would be unable to show that "only [Marshall] could have" opened the cell door, *id.,* and that that inability warranted summary judgment against him, that suggestion appears to impose on Fischl an unduly heavy burden of proof. Fischl is not required to prove that no one else could have opened the door; rather, he will sufficiently establish Marshall's involvement if he persuades the jury that it is more likely than not Marshall who did so or allowed someone else to do so.

Finally, although the district court weighed heavily the fact that Marshall was

periodically away from the officer's cage while he walked the Four Company corridor to determine whether or not anything was amiss in the cells, that fact did not warrant the court's dismissing as a matter of law the claim that Marshall permitted and encouraged the inmates to enter Fischl's cell and attack him. Fischl testified that the attack took place between 9:00 a.m. and 9:30 a.m.; Marshall's log book indicates that, within that period, he made rounds at 9:17 and 9:27. Hence, he was in the control area from 9:00 until 9:17; and after 9:17, he was in the corridor for some period, starting out on two tours before 9:30. Assuming the accuracy of Fischl's estimates that the attack occurred between 9:00 and 9:30 and lasted some 10 minutes, the record suggests that Marshall either was in the control area at the time Fischl's cell door was opened to let the inmates in, or was in the corridor while the attack was going on. The record would thus permit a reasonable juror to find either that Marshall opened the cell door for the inmates himself, or that he was in the vicinity of the ongoing attack and, despite Fischl's shouts, knowingly did nothing to stop it. Either would suffice to show Marshall's personal involvement.

Alternatively, the jury might look at the tour times shown in Marshall's log book (i.e., 7:30 a.m., 8:15 a.m., 9:17 a.m., 9:27 a.m., 10:00 a.m., 10:50 a.m., 11:27 a.m., 12:00 noon, and 12:30 p.m.) and infer that the tour at 9:27 was an anomaly, given that all of the other tours were at least a half-hour apart, whereas the 9:27 tour was begun just 10 minutes after the start of the previous tour. Viewing that deviation from routine in conjunction with the evidence, discussed in Part II.B. below, that Armitage collaborated with the inmates in planning the assault, the jury could permissibly infer that Marshall was instructed by Armitage to leave the cage briefly for the anomalous tour at 9:27, and to leave it unlocked, thereby permitting Armitage to enter the cage and unlock Fischl's cell without Marshall's seeing him do so. (We note that Marshall did not state, either in his deposition or in his affirmations, that he in fact locked the lockbox and the cage each time he left the cage.) Taking this view of the record, the jury could infer on Mar-

shall's part at least a deliberate disregard for Fischl's safety.

In sum, the district court's conclusion that "it *should* not be inferred" that it was Marshall who opened the cell door, Opinion at 10 (emphasis added), was based on the court's own weighing of the evidence, its drawing of inferences adverse to Fischl, and its unfavorable assessments of Fischl's credibility, matters that were not within the province of the court on a motion for summary judgment. With all permissible inferences drawn in Fischl's favor, and without assessment of his credibility, the record suffices to present a genuine issue as to whether Marshall was personally involved in permitting the attack on Fischl.

**B.** *The Dismissal of the Complaint Against Armitage*

█ In support of his contention that Armitage was personally involved in permitting the assault, Fischl testified to both first-hand and second-hand evidence. Fischl's first-hand evidence included his testimony that after the attack, Armitage twice visited him in the hospital and threatened him, and that on one of those visits Armitage was accompanied by two of the attackers. He also testified that after he left the hospital, Armitage repeatedly threatened his life if Fischl were to "press charges on us." The district court found this evidence insufficient to defeat summary judgment, reasoning that "mere allegations of verbal abuse, threats or defamations by a correctional officer to a prisoner are not cognizable in a Section 1983 action," and that there was no showing that the alleged threats had been carried out. Opinion at 11. This reasoning was flawed. Fischl does not seek to recover for the pos-tattack threats; he seeks to recover for the assault. Armitage's bringing two of the attacking inmates with him when he visited Fischl in the hospital, discussing the assault, and threatening Fischl with further harm are admissible to show Armitage's collaboration with Fischl's attackers. And Armitage's warning Fischl not to bring charges against "us" is admissible to show Armitage's own acknowledgement of his involvement.

Accordingly, this testimony would be admissible at trial and, if credited by the jury, would suffice to permit a finding of the personal involvement of Armitage. The jury would of course be free to disbelieve Fischl's testimony, but the assessment of his credibility is within the province of the jury alone. Fischl's deposition testimony as to those threats thus sufficed to defeat the motion for summary dismissal of his claim against Armitage.

Fischl's second-hand evidence was his testimony that just prior to the attack, he heard Fuquan make a statement that indicated that the inmates were operating on instructions from Sergeant Armitage, to wit, "Sergeant says no steel. No steel. As far as weapon [*sic*], no steel. He said, We got ten minutes. The sergeant said we got ten minutes. No steel." The district court concluded that this evidence should not be considered in opposition to the summary judgment motion because at trial it would be inadmissible as hearsay. Despite Fischl's acceptance of the court's characterization of this statement as hearsay, we do not agree.

■ Fischl's testimony as to the Fuquan statement is subject to analysis as potentially double hearsay if offered (a) for the truth of so much of Fuquan's statement as indicated that it was the "sergeant" who had given instructions, and (b) for the truth of what the "sergeant" allegedly told him. We would conclude that neither part is hearsay. As to the instructions attributed to Sergeant Armitage—*i.e.*, that the inmates should not use weapons made of steel and should not continue the assault for more than 10 minutes—there plainly would be no hearsay problem for two reasons. First, as Armitage is a party to this action, his statements when offered against him are not hearsay, *see* Fed.R.Evid. 801(d)(2)(A). Second, this statement would not be offered for the truth of its contents, *see* Fed.R.Evid. 801(c), but rather for the simple fact that Armitage made a preattack statement to the inmates with regard to the assault, revealing his foreknowledge and endorsement of the assault.

■ The statement of Fuquan that it was the "sergeant" who had instructed him, which is the statement the district court concluded was hearsay, is subject to a different analysis. While that statement would be offered for the truth of its content, *i.e.*, that it was in fact Armitage who had made the preattack statement to the inmates, we would view it as falling outside the definition of hearsay because it was the statement of a coconspirator in furtherance of the conspiracy, *see* Fed.R.Evid. 801(d)(2)(E). When a statement is offered under this Rule, the trial court must conclude that it is not hearsay if it finds by a preponderance of the evidence, on this preliminary question of admissibility, (a) that there was a conspiracy, (b) that the statement was made during the course of and in furtherance of the conspiracy, and (c) that both the declarant and the party against whom the statement is offered were members of the conspiracy. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). In making these preliminary factual determinations, the court may take into account the proffered out-of-court statements themselves if those statements are sufficiently reliable in light of independent corroborating evidence. *See id.*

■ The present record is sufficient to satisfy these elements. First, Fischl testified that he was assaulted in his cell by six inmates; and it is undisputed that the inmates could not enter Fischl's cell unless it was unlocked, that the cell door could be unlocked only from the officer's cage, and that only officers had keys to the cage and the lockbox. Thus, there is plainly evidence to show the existence of a conspiracy whose members included (a) Fuquan, (b) the other assaulting inmates, and (c) at least one E–Block officer who opened, or permitted the opening of, the cell door to let the inmates get at Fischl. Second, there could be no question that the Fuquan statement, if uttered, was in furtherance of that conspiracy. That statement relayed instructions as to the extent to which the attack should be perpetrated, in terms of duration and materiel.

The final element, that Armitage was a member of the conspiracy, is supported by a variety of independently admissible evidence, including (1) the fact that the attacking in-

mates needed the cooperation of at least one corrections official; (2) the facts that Armitage was regularly in charge of E–Block, was on Four Company on the morning of September 4, and was informed about Fischl's flooding the area the night before, both by the night-shift officers and by aggrieved inmates; (3) Fischl's testimony that Armitage brought two of the attackers with him to see Fischl on one of the hospital visits during which Armitage referred to the assault and threatened Fischl further; (4) Fischl's testimony that Armitage adverted to the assault in language using the first person plural, saying that Fischl had better not press charges against "us"; and (5) the fact that Marshall, who might otherwise be thought the most likely person to have opened the cell door, given his position as Four Company officer, was not assigned to E–Block on any day other than September 4, had had no past experience with Fischl, and hence arguably, as the district court opined, *see* Opinion at 10, had no motive to orchestrate an attack on Fischl. Having seen no evidence that any of the other company officers had any connection with Fischl or Four Company on September 4, we would conclude that the independently admissible evidence lends credence to Fuquan's identification of Sergeant Armitage as the officer who orchestrated the attack on Fischl.

Accordingly, assuming a trial record similar to the record before us, the properly admitted evidence would be sufficient to warrant the court's finding that Fuquan's statement to the other attacking inmates as to Armitage's instructions regarding the attack was a nonhearsay statement of a coconspirator within the meaning of Rule 801(d)(2)(E). The jury, of course, would remain free to disbelieve Fischl's testimony that Fuquan made such a statement, or indeed to disbelieve any part of Fischl's testimony, either because he had not mentioned the Fuquan statement earlier or for some other reason.

## CONCLUSION

We have considered all of defendants' arguments in support of summary judgment and have found them to be without merit. The judgment of the district court is vacated and the matter is remanded for further proceedings not inconsistent with this opinion.