Ray M. FENDER, Plaintiff–Appellant,

v.

Fred BULL, Correctional Officer,
Defendant–Appellee.

No. 04–3898.

United States Court of Appeals,
Eighth Circuit.

Submitted: Sept. 15, 2005.

Filed: Feb. 10, 2006.

Matthew L. McBride, argued, Omaha, NE, for appellant.

Maureen E. Hannon, argued, Asst. Atty. Gen., Lincoln, NE (Eileen L. McBride, Asst. Atty. Gen., on the brief), for appellee.

Before LOKEN, Chief Judge, LAY and SMITH, Circuit Judges.

LOKEN, Chief Judge.

Virginia prison officials transferred inmate Ray Fender, first to Minnesota in 1989, then to the Nebraska State Penitentiary in 1998, to protect him from retaliation because he had exposed a plot by the Pagan Motorcycle Gang to kill a Virginia corrections officer. On the morning of July 3, 2001, Fender awoke in his cell to find another inmate stabbing him in the back with a sharpened screwdriver. The attacker growled, "Nothing personal. Just a message from Pagan." The masked attacker turned Fender over and attempted to slash his throat. Fender warded off the attacker, who ran from the cell and has never been identified. Fender suffered arm and shoulder injuries, cracked teeth, puncture wounds to his back and left arm, and two cuts under his chin.

Fender filed this § 1983 action against numerous correctional officials asserting Eighth Amendment claims for failure to protect him from the attack, failure to properly investigate the attack, and failure to properly treat his injuries. The district court granted summary judgment dismissing all claims except the failure-to-protect claim against Officer Fred Bull, who controlled access to Fender's cell at the time of the attack. After extensive discovery, the district court granted summary judgment to Officer Bull, concluding that he is entitled to qualified immunity because Fender presented no evidence that Bull was deliberately indifferent to "a known, excessive risk of serious harm" to Fender. *Pagels v. Morrison,* 335 F.3d 736, 740 (8th Cir.2003); *see generally Farmer v. Brennan,* 511 U.S. 825, 835–40, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Fender appeals the dismissal of his claim against Officer Bull. We affirm.

■ Having reviewed the summary judgment record in the light most favorable to Fender, the non-moving party, we agree with the district court that Fender failed to prove reckless disregard of a known risk of serious harm. Officer Bull did not know that Fender had been transferred from the Virginia prisons for safety reasons, did not know that Fender was an enemy of the Pagan gang, and indeed had never heard of the Pagans. *See Curry v.*

*Crist,* 226 F.3d 974, 978–79 (8th Cir.2000). However, Fender correctly notes that the district court's summary judgment Memorandum and Order did not discuss an alternative theory, raised in Fender's brief to the district court opposing summary judgment, that the discovery record demonstrates that "Bull knew the attack was going to occur and allowed the inmate [attacker] to enter Fender's cell." We consider the issue because it was raised in the district court. Moreover, the theory is sound under Eighth Amendment precedents recognizing that, if Bull "intentionally opened [Fender's] cell door for the purpose of assisting [the attacker] in assaulting [Fender], that intent to cause harm would clearly constitute deliberate indifference for Eighth Amendment purposes." *Newman v. Holmes,* 122 F.3d 650, 653 (8th Cir.1997); *see Pavlick v. Mifflin,* 90 F.3d 205, 209 (7th Cir.1996).

As will become apparent, the issue whether Fender presented sufficient evidence of intent to harm turns on the physical layout of Fender's cellblock and the manner in which its inmates were released for breakfast on the morning of the attack. Fender's cell was in Gallery D of Housing Unit 3. That morning, Bull was manning the control center for galleries B and D. As control center officer, Bull used an electronic panel to control the locks (i) on the door to enter Housing Unit 3, (ii) on the separate doors to enter galleries B and D, and (iii) on each of the forty cell doors in those galleries. An inmate could not enter or leave his cell unless the control center officer unlocked the cell door. However, once opened, the cell door must be manually closed to relock. The inmates were required to close their cell doors when they exited Gallery D for meals, work, or recreation, and when they returned to their cells. On the control officer's panel, a green light signified that a cell door was locked; a red light meant the door was open. When a cell door was left open, the control center officer reminded the inmate to close the door and called a caseworker to close the door if the inmate failed to comply.

Each morning, when it was time for the inmates in Gallery D to leave Housing Unit 3 for breakfast, the control center officer unlocked the two outer doors and the cell doors of inmates on the "early lines," those with medical passes to the clinic and those who ate early and reported for work in a prison industry. When the early lines inmates had closed their cell doors and departed, the control center officer relocked the outer doors. Some minutes later, when it was time for the "regular" breakfast, the control center officer unlocked the outer doors and the cell doors of the remaining inmates in galleries B and D, a process called "running the doors" because it took about a minute to open the cell doors, one at a time, by manipulating individual controls on the electronic panel. Five minutes after opening the cell doors for regular breakfast, the control center officer announced "last call," which told any remaining inmates they had five more minutes to leave for breakfast. Ten minutes after opening the cell doors, the control center officer announced "lockdown," after which no inmate could leave Gallery D. The control center officer could see the Gallery D inmates as they walked down two corridors toward the control center to exit the gallery for breakfast. Fender's cell was close to the control center, so inmates from other cells walked by his cell to exit Gallery D. Inmates who left for breakfast and those who chose to skip breakfast were expected to close their cell doors.

On the morning of the attack, July 3, 2001, it is undisputed that Fender's cellmate left the cell before 6:00 a.m. to work in the prison kitchen and closed the cell door as he left. In an interrogatory an-

swer prepared in late 2003, Bull stated that he opened the cell doors for regular breakfast at 7:15 a.m. Before Bull's deposition some months later, his Daily Log for July 3 was retrieved from the prison archives. In this log, Bull wrote that Gallery D inmates in the "early lines" were released for breakfast at 6:27 a.m. The other Gallery D inmates were released for regular breakfast at 6:40 a.m., last call was at 6:45 a.m., and lockdown was at 6:50 a.m. At his deposition and in a subsequent affidavit, Bull stated that the information in the log was accurate. He explained that the inconsistent breakfast time stated in his earlier interrogatory answer was an "approximation based on my memory." The timing is important because it is undisputed that inmate David Atkinson returned from early lines breakfast before 7:00 a.m., saw an individual matching Fender's description of the attacker running from Gallery D, and found Fender standing in his cell bleeding. Fender averred that regular breakfast was called around 7:15 a.m., after the attack.

In its recitation of background facts, the district court's Memorandum and Order stated:

> On that day, the defendant, operating locks electronically from the glass-enclosed control room, unlocked the cells for the early breakfast at approximately 6:35 or 6:40 a.m. Later, for the regular breakfast he did the same beginning at approximately 7:15 a.m.... The cell doors are allowed to be left open from 6:40 to 6:50 a.m.

This sequence of events, which was not important to the court's later discussion of deliberate indifference, is inconsistent with the summary judgment record. Bull's log stated that the early lines inmates were released for breakfast at 6:27, not 6:35 or 6:40. The log further reflected that the cell doors were open from 6:40 to 6:50, as the court recited, but only because that was the period when the other inmates could leave for regular breakfast. If regular breakfast did not begin until 7:15, as the court also recited, the outer doors and all cell doors—in particular, Fender's cell door—should have been locked between 6:40 and 6:50, because the early lines inmates had departed and regular breakfast had not been called.

■ On appeal, Fender advances two inconsistent theories from these factual uncertainties. In his main brief, Fender argued that the time when regular breakfast was called on July 3, 2001, is a genuine issue of disputed fact and, if he is right that breakfast was not called until 7:15 a.m., there was no reason for his cell door to be open prior to 7:15 a.m. Therefore, Bull must have intentionally opened Fender's cell door to assist the attacker. We reject this theory because the alleged fact dispute is not "genuine" within the meaning of Rule 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

It is undisputed that the Daily Log for July 3, 2001 is a normal business record reflecting that regular breakfast was called at 6:40 a.m. The log was authenticated by Bull, and its purpose was verified by other prison officials. The evidence submitted by Fender supporting a contrary 7:15 starting time was (i) Bull's earlier interrogatory answer, which Bull repudiated with a reasonable explanation after the log was found, and (ii) Fender's assertion that breakfast started at 7:15. This was an unsupported assertion, made more than three years after the fact in response to discovery of the Daily Log. Fender made no reasonable effort in discovery to support the assertion. For example, the initial defendants included caseworker Jurrens, who came to Fender's cell at 7:00 a.m. in response to the reported injury and stayed for some time, and Corporal Duer-

feldt, who arrived at the cell some minutes later and escorted Fender to the medical facility. Either might well have noticed if twenty or thirty inmates in Gallery D headed off to breakfast at 7:15, while they were in or near Fender's cell, yet Fender did not depose either Duerfeldt or Jurrens on this issue. Therefore, on this summary judgment record, Fender's unsupported assertion does not create a genuine fact dispute, because a reasonable jury could only find that the cell doors were open for regular breakfast during the period recorded in the Daily Log, 6:40 to 6:50 a.m. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.2001); *accord Bass v. SBC Commun., Inc.*, 418 F.3d 870, 872–73 (8th Cir.2005); *Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1289 (10th Cir.), *cert. denied*, 537 U.S. 947, 123 S.Ct. 411, 154 L.Ed.2d 291 (2002).

 No doubt recognizing that the record does not support his breakfast starting time theory, Fender argued a different theory in his reply brief. Inmate Atkinson's affidavit stated that he reported the attack to Bull at 6:55 a.m. after seeing the attacker fleeing Gallery D. Therefore, Fender argues, the attacker must have fled after the 6:50 lockdown, in which case he could not have exited the locked-down Gallery D without Bull's assistance in opening the outer doors. This theory, while theoretically possible, is not plausible. It assumes that Atkinson was precise in recalling that he returned to Gallery D after 6:50 and reported Fender's injury to Bull at 6:55. It further assumes that no time or very little time elapsed between Atkinson seeing the attacker flee and reporting Fender's injury to Bull. This is contrary to Atkinson's affidavit, which avers that, after seeing the attacker, he noticed the injured Fender, asked Fender if

he needed help, and then went to notify Bull in the control center, where he had to go "all the way to the side part of the control room and ... bang on the window repeatedly" to get Bull's attention. Thus, it is far more plausible that the clever attacker took advantage of the ten minutes when the doors would be unlocked for regular breakfast to sneak into Fender's unlocked cell, quickly attack Fender with a sharpened weapon, and then exit Gallery D for breakfast before the outer doors were closed at the 6:50 a.m. lockdown.

 It is not normally the court's prerogative to weigh competing fact theories in deciding a motion for summary judgment. But context is important. Here, Fender has no evidence that Bull recklessly disregarded a known risk of a surprise attack by another inmate. Nor is there other evidence that Bull intended to harm Fender, such as the evidence of animosity and retaliatory motive in cases like *Case v. Ahitow*, 301 F.3d 605 (7th Cir.2002), and *Fischl v. Armitage*, 128 F.3d 50, 57–59 (2d Cir.1997),[1] or the direct evidence of a guard's collaboration with attackers in *Pavlick*, 90 F.3d at 208–09. Rather, Fender's theory is that Bull "must have been in on it" because there was no way for the attacker to enter Fender's cell and then escape Gallery D without Bull's assistance. But the summary judgment record establishes that there was another, more plausible way. As the Supreme Court said in an analogous setting, "if the factual context renders [plaintiff's] claim implausible ... [plaintiff] must come forward with more persuasive evidence to support [his] claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

---

1. At an earlier stage of the litigation, Fender stated that he had a good relationship with Bull and described Bull as a "decent" but incompetent man who was "getting up in years and quiet [sic] frankly ... not as sharp as he used to be."

■ The Supreme Court recently reaffirmed that, even when motive is a critical issue, summary judgment is appropriate if the plaintiff fails to "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). Fender failed to do so. Accordingly, we AFFIRM the judgment of the district court. We deny appellee's motion for summary affirmance.

LAY, Circuit Judge, dissenting.

The majority correctly points out that it is very plausible a fellow inmate in D Gallery took the opportunity to enter Fender's open cell during the time the inmates were released for regular breakfast and that Officer Bull had no involvement in the attack. In reaching its conclusion, however, the majority fails to address several facts that, when viewed under the proper summary judgment standard, require our court to leave this question for a jury to resolve. Therefore, I must respectfully dissent.

Fender described his attacker as wearing a stocking cap pulled down over his face with eye holes cut out and a prison-issued sweatshirt. He claimed the attacker was not one of the inmates housed within D Gallery because he failed to recognize his voice. Therefore, Fender theorizes that Bull must have let his attacker into the unit and allowed him to access Fender's cell. In support of this argument, Fender asserts that the inmates were not released for regular breakfast until 7:15 a.m. on July 3, 2001, and therefore there was no reason for Fender's cell door to be open at the time of the attack. Considering the evidence before us in the light most favorable to Fender's claim, I can only conclude that there is a genuine issue of material fact as to the time the inmates were released for regular breakfast on the morning of the attack.

The housing units eat in a certain order each month. The eating schedule rotates each month, but within any given month the inmates in a certain gallery will generally be eating at approximately the same time. While Bull's officer's log for July 3 shows that he released the inmates for breakfast at 6:40 a.m., none of the other officer's logs for July that are in the record show the prisoners being released that early. The breakfast times in the record indicate that, during the month of July, inmates in D Gallery were released for breakfast between 6:57 a.m. and 7:13 a.m. The earlier breakfast time in the July 3 log is especially troublesome because the officer's log sheets for July 1 through July 10 have now been lost by the penitentiary, with the exception of the July 3 log sheet. Moreover, Bull initially stated that the inmates were released for breakfast on July 3 at 7:15 a.m. Bull repudiated that statement after he reviewed the July 3 officer's log and stated that the 6:40 a.m. release time listed there was correct.

The majority accepts Bull's explanation as reasonable and rejects Fender's allegations as lacking support. I cannot agree that a plaintiff's failure to provide the court with all the evidence it desires means that the court may ignore the evidence that is actually contained in the record. In my opinion, Fender has presented evidence that calls into question the time the inmates in D Gallery were released for regular breakfast. The resolution of this factual question is not for the courts to decide by determining the weight and credibility of the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legiti-

mate inferences from the facts are jury functions, not those of a judge ....").

Fender also provided the affidavit of a fellow inmate, David Lee Atkinson, who reported Fender's injuries to Bull. Atkinson claims to have seen an individual, dressed as Fender reported, brush past him and exit D Gallery as Atkinson returned from early breakfast sometime between 6:50 and 6:55 a.m. Fender relies upon Atkinson's statement to assert that, no matter what time breakfast occurred on July 3, an inmate exited D Gallery between 6:50 and 6:55 a.m., a time when D Gallery was supposed to be under lockdown. Once again, the majority rejects Fender's evidence by making factual determinations and weighing the evidence. In my opinion, Fender's assertion that he failed to recognize his attacker's voice and Atkinson's claim that he saw the attacker exit D Gallery when it was under lockdown provides additional evidence for a reasonable jury to conclude that the unknown attacker was not a resident of D Gallery and entered and exited with the aid of Officer Bull.

The majority defends its weighing of the evidence by emphasizing the lack of context for Bull's involvement in the attack. It is undisputed that there is no evidence of animus between Fender and Bull. Fender's alleged attacker is unknown and Fender provided only circumstantial evidence suggesting Bull's involvement in the attack. However, it is important to note that in section 1983 actions brought by inmates, the only evidence of a conflict or involvement by a guard is often based solely upon the assertions of the injured inmate. *See, e.g., Fischl v. Armitage,* 128 F.3d 50, 52–53, 56–59 (2d Cir.1997) (reversing the district court's dismissal of the plaintiff's claim where the plaintiff was assaulted in his cell by six inmates who could not have entered had a guard not opened the cell door, the plaintiff claimed a defendant threatened him while he was in the hospital, and the plaintiff claimed one of his attackers made a statement during the attack that suggested the defendant's involvement). Direct evidence of involvement or motive provided by an inmate is not necessarily any more credible than the circumstantial evidence provided by Fender in this case, and the lack thereof does not justify the majority improperly drawing inferences and weighing evidence in this case. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (quotation and citation omitted). Moreover, the Supreme Court of the United States has emphasized, on various occasions, that the question of subjective intent is not an issue in the analysis of qualified immunity. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

I will not pretend to profess that this is a perfect plaintiff's case. I merely wish to emphasize that at the summary judgment stage, we are bound to interpret the evidence in the light most favorable to the nonmoving party. With this obligation in mind, I believe that Fender is entitled to a trial where a jury will properly weigh the evidence he presents. Therefore, I respectfully dissent.