**In re TRICO MARINE SERVICES, Debtor.**

**Steven Salsberg, Esq. and Gloria Salsberg, Plaintiffs/Appellants,**

v.

**Trico Marine Services, Inc., Trico Marine Assets, Inc., and Trico Marine Operators, Inc., Defendants/Appellees.**

No. 07 Civ. 8422(DLC).

United States District Court, S.D. New York.

Feb. 21, 2008.

Steven Salsberg, Esq., New York, NY, pro se.

Joseph P. Garland, Law Office of Joseph P. Garland, New York, NY, for Appellant Gloria Salsberg.

Matthew Solum, Kirkland & Ellis LLP, New York, NY, for Appellees.

### OPINION & ORDER

DENISE COTE, District Judge.

Appellants Steven Salsberg ("Mr. Salsberg") and his mother Gloria Salsberg ("Ms. Salsberg") (collectively, the "Salsbergs" or the "appellants") appeal from the judgment entered in this adversary proceeding by the United States Bankruptcy Court for the Southern District of New York (Bernstein, C.J.). They also appeal from the bankruptcy court's denial of their motion to amend their pleadings. For the following reasons, the decisions of the bankruptcy court are affirmed.

## BACKGROUND

### I. Trico's Bankruptcy

These facts are not in dispute, and are drawn from the decisions of the bankruptcy court. *See In re Trico Marine Servs., Inc.*, 374 B.R. 529 (Bankr.S.D.N.Y. 2007) ("*Trico IV*"); *In re Trico Marine Servs., Inc.*, 360 B.R. 53 (Bankr.S.D.N.Y. 2006) ("*Trico III*"); *In re Trico Marine Servs., Inc.*, 343 B.R. 68 (Bankr.S.D.N.Y. 2006) ("*Trico II*"); *In re Trico Marine Servs., Inc.*, 337 B.R. 811 (Bankr.S.D.N.Y. 2006) ("*Trico I*"). In 2001, Trico Marine Services, Inc., a business providing marine support services to the oil and gas industry, began experiencing a precipitous decline in its operating results. (Trico Marine Services, Inc. and its domestic subsidiaries, Trico Marine Assets, Inc. and Trico Marine Operators, Inc., will be referred to collectively as "Trico"). Trico began negotiating a pre-petition bankruptcy plan with a group of its creditors in June 2004. The parties reached agreement in September 2004 on a plan that proposed to cancel Trico's existing common stock and to distribute new common stock to certain creditors in satisfaction of their claims. Holders of the old, cancelled common stock would receive warrants exercisable at times and prices set forth in the proposal.

Trico filed a disclosure statement outlining the plan with the Securities and Exchange Commission on November 12, 2004. Exhibit C to the disclosure statement included Trico's financial projections for revenue and EBITDA (earnings before interest, taxes, depreciation, and amortization) from 2004 through 2009. Trico projected total revenue of $103.7 million and EBITDA of $13.6 million for 2004. These projections were based on Trico's actual financial results through September 30, 2004, and the projected results for the fourth quarter.

Trico commenced prepackaged bankruptcy proceedings on December 21, 2004. At the time, its estimated total pre-restructuring indebtedness was nearly $400 million, and its interest expense for 2004 was estimated to be $32.4 million. Approximately $250 million of Trico's indebtedness was attributable to its Senior Notes; an additional $28.4 million was attributable to interest on those Notes. The prepackaged plan presented to the bankruptcy court would eliminate the entire Senior Note debt. As The Honorable Stuart M. Bernstein observed, "[a]bsent confirmation, the projected 2004 EBITDA would fall approximately $19 million short of the amount needed just to pay the 2004 interest expense due on the Senior Notes." *Trico IV*, 374 B.R. at 533. Mr. Salsberg, a Trico shareholder, filed an objection to the plan on January 10, 2005.

### II. Plan Confirmation

A hearing was held on January 19 to address the disclosure statement, the plan, and Mr. Salsberg's objection. Trico's sole witness, Richard NeJame, a director in the restructuring advisory group at Lazard Freres, was qualified to testify as an expert in the fields of valuation and restructuring. NeJame described his extensive due diligence of Trico, and opined that Trico was insolvent. Absent the restructuring, NeJame testified, Trico's shareholders would receive nothing. Were the restructuring approved, the Senior Noteholders would receive between thirty-five and forty-five percent of what they were owed.

Mr. Salsberg cross-examined NeJame, who testified that his valuations of Trico were based on information available to him in October 2004. He had not updated his estimates based on subsequent data, and he did not know Trico's fourth quarter results. Under questioning from Mr. Sals-

berg concerning the potential effects of any misstatements contained in Trico's revenue projections, NeJame averred that, because a large component of Trico's operating costs were fixed, between seventy and eighty percent of any additional revenue would go "straight down to EBITDA." That is, NeJame clarified, any error in revenue projection would "make a big difference in the EBITDA bottom line." NeJame emphasized, however, that his valuation of Trico assumed a quadrupling in EBITDA from 2004 to 2008.

Mr. Salsberg called as his sole witness Trevor Turbidy, Trico's chief financial officer. Because the instant action turns entirely on Turbidy's testimony, it is quoted at some length. The direct examination began as follows:

Q: Good afternoon. Do you know what the fourth quarter revenues are for Trico?

A: We have not finished our fourth quarter consolidation yet. So, no, I don't have an estimate for that number.

Q: Do you have a preliminary estimate?

A: I wouldn't be allowed to disclose that under FD at this point.

According to Chief Judge Bernstein, Turbidy's reference to FD was to SEC Regulation FD, 17 C.F.R. § 243.100 *et seq.*, which prohibits certain disclosures of material non-public information regarding an issuer or its securities. At this point in the examination, counsel for Trico objected, reiterating Turbidy's FD concern and questioning the relevance of Mr. Salsberg's examination. The bankruptcy court engaged the parties in a brief colloquy concerning the objections. The colloquy, in pertinent part, went as follows:

TRICO COUNSEL: I think the issue that we have here as Mr. Turbidy has testified is that he doesn't have the

actual and with regard to preliminary I'm just not quite sure why that's probative when at this point [in] time there could be a number of variables that would not be included in a preliminary est[im]ate. So the point is given the risk of inadvertent FD and the fact that it's very preliminary just doesn't really serve any probative value.

THE COURT: What's the probative value of a preliminary estimate when the—what's the probative value of a preliminary estimate?

MR. SALSBERG: The probative value is that they're saying that revenue growth isn't that great and I think maybe it is and I'm trying to find out.

THE COURT: But you're talking about one more quarter since projections.

MR. SALSBERG: Well, they bottomed out in the first quarter of '04 and then since then they grew very, very handsomely in the second and third quarter compared to the first quarter of '04. If the fourth quarter of '04 is up that shows—that shows that very positive things are happening and then—and they said that their revenue is only going to increase 5 point something percent from '04 to '05. That may imply that their forecasts are far too conservative to be reasonable.

TRICO COUNSEL: Your Honor, if I could just address that point again. The plan here, the projections in the plan are based on five years which is twenty quarters. An up tip [sic] in one quarter is just not going to be material, number one. Number two, I think this is the same situation we've seen in other cases. The plan is not necessarily about hitting a number precisely on the nose. I fail to see the probative value especially when

weighed against the prejudice of an FD disclosure, the fact that it's extremely preliminary.

. . .

THE COURT: I'm going to overrule the objection. The argument is that if they exceeded expectations for this quarter maybe their future projections are also conservative or too conservative. That's what the argument is.

. . .

TRICO COUNSEL: Your Honor, if I may just briefly. Would it be possible to alter the questions that the question is directed in such a way as to whether there's been any material change in the financial circumstance of the company in the last two months which would change the valuation conclusions?

The court then proceeded to question Turbidy: THE COURT:

THE COURT: Let me ask the question. What did you project-did you have a projection for the fourth quarter of 2004?

TURBIDY: Yes, we did.

THE COURT: What was that projection?

TURBIDY: I don't recall the exact number of revenue projections.

THE COURT: Is that in the disclosure statement?

TRICO COUNSEL: Your Honor, I don't believe it is is [sic] an aggregate number. I think it's just a 2004 yearly which based on the time this was prepared I believe there would have been two quarters of actual results and two quarters of projected results contained in the aggregate for '04.

THE COURT: Do you recall whether your actual expense for the fourth

quarter of 2004 was higher, lower or consistent with the projected results?

TURBIDY: In total 2004 was consistent with our projections.

THE COURT: Just the last quarter?

TURBIDY: It was fairly consistent, yes. It wasn't spot on dollar for dollar.

THE COURT: It is higher or lower?

TURBIDY: I believe it was slightly higher.

THE COURT: I'll take that answer they higher [sic]—they did better than they projected. I understand their concern about disclosing in a court, particularly a preliminary analysis, but they're saying they did better. I think that answers your question.

Mr. Salsberg intervened at this point and asked, "How much better?" Turbidy replied, "Not materially."

Chief Judge Bernstein overruled Mr. Salsberg's objection and confirmed the plan. He credited NeJame's testimony concerning the value of Trico, and concluded that the company was "hopelessly insolvent." Chief Judge Bernstein made no mention of Turbidy or his testimony in his decision. Mr. Salsberg did not appeal from the order confirming the plan.

## III. The Adversary Proceeding

Following confirmation of the plan, Mr. Salsberg transferred some of the warrants distributed thereunder to Ms. Salsberg. Together, on July 19, 2005, they commenced an adversary proceeding before the bankruptcy court to vacate the confirmation order pursuant to 11 U.S.C. § 1144, which provides that a plan of confirmation may be revoked "if and only if such order was procured by fraud." The Salsbergs claimed that Turbidy's testimony at the confirmation hearing had been perjurious and that the plan confirmation

had therefore been procured by fraud. Specifically, they contended that Turbidy had lied when he testified that the 2004 fourth quarter results were fairly consistent with, and slightly but not materially higher than, Trico's fourth quarter projections. At the time of Turbidy's testimony, the Salsbergs contended, he knew that Trico's fourth quarter revenue and EBITDA were substantially higher than the projections. They argued that his testimony was intended to mislead the court into believing that Trico was in worse financial condition than it actually was, compelling the court to approve the bankruptcy plan, from which, the Salsbergs alleged, Turbidy would benefit personally.

By Opinion dated January 6, 2006, the bankruptcy court ruled that it could not revoke the plan under Section 1144 because the plan "would be exceedingly difficult to unwind and impossible to protect innocent third parties." *Trico I*, 337 B.R. at 815. The court granted the Salsbergs leave to amend their complaint within thirty days "to seek other, appropriate relief, if any." *Id.* at 816. The Salsbergs moved for reconsideration. The bankruptcy court granted the motion for reconsideration, but adhered to its original decision denying revocation under Section 1144. *Trico II*, 343 B.R. at 68.

The Salsbergs then amended their complaint, demanding damages from Trico under Section 1144 and alleging that Trico had committed a "fraud on the court." Following this amendment, the Salsbergs moved to amend their complaint again to add Turbidy as a defendant in the fraud-on-the-court claim. By Opinion dated November 22, 2006, the bankruptcy court denied the Salsbergs' motion to amend. The court ruled that, based on Second Circuit law, amendment would be futile for three

reasons: (1) the Salsbergs' claims against Turbidy rested solely on his alleged perjury; (2) the Salsbergs failed to allege that an officer of the court perpetrated the fraud; and (3) the proposed amended complaint failed to allege that Mr. Salsberg had no opportunity to demonstrate the falsity of Turbidy's testimony. The Salsbergs moved for reconsideration, and the bankruptcy court denied that motion. *Trico III*, 360 B.R. at 60–61.

On May 21, 2007, the bankruptcy court conducted a trial on the Salsbergs' fraud claim against Trico. The trial was limited to the single question of whether Turbidy knowingly lied about Trico's fourth quarter results with the intent to deceive the court at Trico's confirmation hearing. Turbidy, Mr. Salsberg, and Ms. Salsberg testified at the trial.[1] According to the bankruptcy court, the trial evidence showed the following. First, by the time of the confirmation hearing, Turbidy knew that Trico had exceeded its fourth quarter projections of both revenue and EBITDA. Trico had projected $24.9 million in fourth quarter revenue, but had achieved actual revenue of $33.3 million-approximately 34% higher than projected. Likewise, Trico had projected fourth quarter EBITDA of $4.1 million, but the aggregate EBITDA for October and November alone totalled $5,599 million—approximately 33% higher than projected, even absent December's actual results. Second, although he had received December 2004 revenue figures, Turbidy had not received information regarding December 2004 EBITDA by the time he testified at the confirmation hearing, but he anticipated an unusually large charge during the quarter attributable to a British pension plan supported by Trico. At the time of the confirmation hearing, Turbidy did not know the actual number represent-

---

1. Mr. Salsberg and Ms. Salsberg testified only with regard to Ms. Salsberg's standing, an

issue the bankruptcy court had raised *sua sponte*.

ing the charge, but he understood that the charge would "severely impact" fourth quarter EBITDA. *Trico IV*, 374 B.R. at 536. Third, information supplied after the confirmation hearing revealed that EBITDA was negative in December, bringing fourth quarter EBITDA down to $5.4 million—still approximately 32% higher than projected. Operating expenses were also higher in the fourth quarter due to three special charges: $2.7 million for the British pension plan, $700,000 for adjustment to a redundancy reserve, and $1.5 million for an inventory reserve. Fourth, when Turbidy testified that Trico's fourth quarter results were fairly consistent with, and slightly but not materially higher than, its projections, he was focused on EBITDA and not revenue. The Salsbergs contended at trial that he had been focused on revenue.

The bankruptcy court deemed Turbidy's testimony at trial to be credible, and "found him to be honest, candid and forthright," *Trico IV*, 374 B.R. at 536, and therefore ruled that at the time of his testimony, Turbidy "held the honest belief that the actual results for the fourth quarter EBITDA, which were not then final and were subject to credit and other adjustments, including a large UK pension charge, would not be appreciably higher or materially better than the fourth quarter EBITDA projection." *Id.* at 540. With regard to the materiality of the discrepancy between Trico's projected fourth quarter EBITDA and its higher actual results, the bankruptcy court ruled that "when Turbidy testified that fourth quarter EBITDA was slightly but not materially higher, he was referring in general to the valuation of Trico, and specifically, to the effect that the slightly higher quarterly

EBITDA had on Trico's ability to meet a $9 million quarterly interest expense." *Id.* The court further ruled that, although Turbidy had a duty to disclose material information, his failure to inform the court of the pending British pension charge did not evidence an intent to deceive the court or anyone else. *Id.* at 540–41. Accordingly, Chief Judge Bernstein ordered the adversary proceeding to be dismissed.

Appellants timely filed their notice of appeal on September 28.[2] They seek review of the bankruptcy court's August 24, 2007 judgment after trial as well as its November 22, 2006 denial of their motion to amend their complaint to bring a fraud-on-the-court claim against Turbidy.

## DISCUSSION

### I. Standard of Review

■ A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree." Fed. R. Bankr.P. 8013. On appeal, the legal conclusions of the bankruptcy court are reviewed de novo, but the findings of fact are reversed only when they are "clearly erroneous." *Kuhl v. United States*, 467 F.3d 145, 147 (2d Cir.2006) (citation omitted) *(per curiam)*; *In re Worldcom, Inc.*, 339 B.R. 836, 840 (S.D.N.Y.2006). "While the trial court's findings of fact are not conclusive on appeal, the party that seeks to overturn them bears a heavy burden." *In re Miner*, 229 B.R. 561, 565 (2d Cir. BAP 1999). The reviewing court must be left with a "definite and firm conviction" that a mistake has been made. *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir.2003) (citation omitted). Where the trial court's "factual finding is based upon a credibility determination, we are mindful that particularly strong deference should be granted to the finding in light of the factfinder's

---

2. Appellants sought leave to file an oversized and corrected reply brief on December 14, 2007. Their motion was granted on January 22, 2008, and appellants' Corrected Reply Brief was considered in connection with this appeal.

unique ability to assess the witness." *Id.* (citation omitted).

## II. Turbidy's Alleged Misrepresentations

■ As the bankruptcy court correctly observed, New York law governed the Salsbergs' fraud claim. Under New York law, a " 'fraud claim is defined as a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury.' " *Trico IV*, 374 B.R. at 537 (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 104 (2d Cir.2001)). The trial focused on the truthfulness of Turbidy's statements at the confirmation hearing and, to a lesser extent, his scienter in offering them.

Appellants contend that the bankruptcy court clearly erred in finding that Turbidy had testified truthfully about Trico's financial condition at the confirmation hearing. They contend that Turbidy's statements that Trico's fourth quarter results were "consistent with our projections," "slightly higher" than those projections, and "[n]ot materially" better than those projections were false and misleading, and that Turbidy's failure to inform the court of certain charges that would depreciate Trico's fourth quarter EBITDA was intentional and purposefully misleading. Because appellants have not demonstrated that the bankruptcy court's findings were clearly erroneous, the decision of the bankruptcy court is affirmed.

The bankruptcy court determined that Turbidy's testimony was not false because that testimony turned on Trico's EBITDA, not revenue, and Turbidy's statements were honest and truthful with regard to EBITDA in light of the purpose for which the confirmation hearing was held, i.e., the valuation of Trico. Appellants cavil to varying extents with both of these propositions.

### A. Turbidy's Focus on EBITDA

■ The bankruptcy court determined that Turbidy's confirmation hearing testimony focused on EBITDA, and not revenue, based on Turbidy's responses to the court's questions during the confirmation hearing, Trico's public filings in connection with its reorganization, and Turbidy's testimony at trial. At the confirmation hearing, Turbidy was asked about Trico's "revenue" as well as its "actual experience." He uniformly replied with reference to EBITDA because, the bankruptcy court found, "EBITDA (and cash flow) directly reflected Trico's financial health and the ability to pay its bills." *Trico IV*, 374 B.R. at 538. This was corroborated by Trico's Form 10K, published after the confirmation hearing and admitted into evidence at trial, which stated that during Trico's reorganization, the company focused "primarily on cash flow from operations and net changes in cash and cash equivalents in order to fund operations, maintain the fleet and service its debt." *Id.* Finally, Turbidy testified at trial that he understood the questions at the confirmation hearing to focus on Trico's EBITDA, and the court specifically noted that it found "that Turbidy testified credibly when he said that his answers were focusing on EBITDA, not revenue." *Id.*

Appellants scarcely contend that this finding is clearly erroneous. At most, they intimate that Turbidy may have been "confused" about the basis for his testimony, and that the bankruptcy court therefore erred in determining that the testimony was based on EBITDA. This is insufficient to shoulder appellants' weighty burden in overturning a trial court's finding of

fact.[3]

### B. The Truthfulness of Turbidy's EBITDA Statements

Appellants rest the gravamen of their appeal on a challenge to the bankruptcy court's finding that Turbidy's testimony with respect to Trico's EBITDA was not false. They contend that Turbidy's statements that Trico's fourth quarter EBITDA was "consistent with our projections," "slightly higher" than those projections, and "[n]ot materially" better than those projections were patently false in light of the fact that Trico's actual fourth quarter EBITDA was approximately 33% better than Trico's projections. Indeed, appellants claim, although Turbidy had not seen December 2004 EBITDA figures, he was aware that the total EBITDA from October and November had already surpassed Trico's projections for the quarter as a whole.

The bankruptcy court asserted that Turbidy's testimony at the confirmation hearing had to be understood in the context of the "bigger picture" of Trico's general financial health at the time. *Id.* at 539. Despite substantial EBITDA growth in November 2004, Trico posted negative operating cash flow in the same month, and its cash had declined by $2.55 million. It also suffered net operating losses and negative operating cash flow in October and November. Trico's fourth quarter and annual results, published after the confirmation hearing but introduced into evidence at trial, "confirmed Trico's bleak financial prospects," *id.*, showing net operating losses of $8.5 million, negative cash flow from operations totaling $4.5 million, and a cash loss of $3.3 million in the month of December 2004 alone. Against this backdrop of a "company teetering on the brink of survival," *id.* at 538–39, the $1.3 million difference between Trico's projected and actual EBITDA that existed at the time of the confirmation hearing "was only 'slightly' higher than the projections." *Id.* at 539. That is, "when Turbidy testified that fourth quarter EBITDA was slightly but not materially higher, he was referring in general to the valuation of Trico, and specifically, to the effect that the slightly higher quarterly EBITDA had on Trico's ability to meet a $9 million quarterly interest expense." *Id.* at 538.

Appellants contend that Trico's fourth quarter EBITDA was substantially higher than the projections, and that the bankruptcy court therefore clearly erred in crediting Turbidy's testimony to the effect that EBITDA was only "slightly higher." Their challenge takes a variety of forms, each of which fails.

First, appellants rely on several internal Trico reports stating that the company experienced "dramatically" higher EBITDA and revenue than was set forth in the projections included in Trico's disclosure statement. But the bankruptcy court's decision turned heavily on the context in which Turbidy testified, and the general backdrop against which the $1.3 million difference from EBITDA projections was to be evaluated. Whether described as "dramatically" or "slightly" higher, there is no dispute as to the figures themselves. Appellants' citation to these reports,

---

3. It should be noted that although the bankruptcy court specifically found that Turbidy had based his testimony on EBITDA, it observed that any dispute about whether Turbidy's testimony was based on revenue or EBITDA was "largely immaterial under the Salsbergs' theory because the percentage changes [between projections and actual results] were approximately the same." *Trico IV*, 374 B.R. at 538. That said, Turbidy's focus on EBITDA was central to the bankruptcy court's analysis and therefore, on appeal, will furnish the basis for this Court's analysis.

which emanated from an entirely different context, does nothing to undermine the bankruptcy court's finding concerning the veracity of Turbidy's testimony in the context of the confirmation hearing.

Second, appellants appear to contend that Trico's fourth quarter EBITDA was actually sufficient to meet the company's quarterly interest expense, and that the bankruptcy court's finding was accordingly erroneous. Appellants observe that Trico's fourth quarter EBITDA was $5.4 million, and that the special charges Trico was required to pay amounted to $4.9 million. Together, this $10.3 million would have been sufficient to meet Trico's $9 million quarterly interest. This argument fails, however, because it does not account for the fact that Trico did in fact have to pay the special charges. Even if the quarterly interest charge was $7.6 million, as appellants contend in conclusory fashion, its $5.4 million in actual EBITDA was plainly insufficient to meet its debt.

Third, in a transparent effort to adjust artificially the standard of review applicable to their appeal, appellants contend that this exclusively fact-based dispute presents an issue of law to be reviewed de novo. They pose this putative issue of law: "If a witness knows a fact and is asked about that fact at trial but misunderstands the question and answers a different question and gives an answer that is true as to the question-not-asked but false as to the question-actually asked, has the witness testified falsely?" This is hardly a legal issue. Rather, appellate consideration of Turbidy's testimony focuses exclusively on whether the facts adduced by the bankruptcy court in determining that Turbidy testified truthfully were clearly erroneous.

■ Finally, appellants contend that even if Turbidy did not intentionally mislead the bankruptcy court with his false testimony, he was recklessly indifferent to the falsity of his statements. But in the context of a fraud claim, "reckless indifference" is only pertinent if the statements at issue were in fact untrue. As the Second Circuit has held, liability lies for fraud under New York law only for statements "known by defendant to be untrue or recklessly made." *Suez Equity Investors, L.P.,* 250 F.3d at 104. "Known to be untrue" and "recklessly made" are simply two different knowledge standards. The requirement that the statements at issue actually be untrue remains the same. Because the bankruptcy court found that the statements were in fact true, and because this finding was not clearly erroneous, this argument fails.

In sum, none of appellants' arguments demonstrates clear error in the bankruptcy court's finding that Turbidy testified truthfully as to Trico's fourth quarter EBITDA results. This finding is therefore affirmed.

### III. Turbidy's Alleged Omissions

■ Appellants contend that Turbidy had an obligation to disclose at the confirmation hearing certain information he knew concerning Trico's steadily improving financial health, including, for example, the expiration in 2005 of contracts unfavorable to Trico. They aver that Trico's fourth quarter 2004 performance was an improvement over the rest of that year's performance, and that "Trico had been climbing steadily out of the 'cellar'" since the first quarter of 2004. "With full disclosure," appellants contend, the bankruptcy court would have perceived "at least a material possibility that Trico's prospects were substantially improved," and would have declined to confirm the reorganization plan.

With only one exception, these alleged omissions are raised for the first time on

appeal. Although they now contend that there was certain information "Turbidy was obliged to disclose even if he was not being deceptive in the answers he gave to the questions he was asked," appellants represented before the bankruptcy court that the court did not need to "determine that Mr. Turbidy had an affirmative, independent obligation to disclose" anything. Indeed, there is no evidence that appellants raised any of these particular omissions before the bankruptcy court. Because appellants now advance an argument they specifically repudiated below, this argument will not be considered for the first time on appeal.[4] *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

The sole alleged omission considered by the bankruptcy court concerned the three special charges that deflated Trico's fourth quarter EBITDA. The Salsbergs argued before the bankruptcy court that "even if Turbidy's testimony was technically correct, he should have voluntarily disclosed that the 'slightly' but not 'materially' better fourth quarter EBITDA was negatively impacted by three special, unusually large expenses." The bankruptcy court first ruled that, as an accounting matter, it was appropriate for Trico to deduct these expenses from its income in calculating its EBITDA. Having found no accounting impropriety, the court then found that the Salsbergs had "failed to show that Turbidy intended to deceive anyone when he referred to the fourth quarter EBITDA, without stating that the result included the special UK pension charge." *Trico IV,* 374 B.R. at 540. On appeal, appellants have not specifically controverted the bankruptcy court's finding, nor have they adduced any facts to show that the bankruptcy court was in error. Accordingly, the bankruptcy court's finding with regard to Turbidy's failure to reveal the fourth quarter special charges is affirmed.

## IV. Motion to Amend

Appellants "recognize that if the Court affirms the Bankruptcy Court's conclusions at the trial, there would be no factual support for the fraud-on-the-court claim and that the Bankruptcy Court's decision on amending would therefore be moot." Appellees do not dispute this contention. Accordingly, having found that the bankruptcy court's trial conclusions were not clearly erroneous, this Court need not address the appeal of the bankruptcy court's denial of appellants' motion to amend.

## CONCLUSION

For the foregoing reasons, the decision of the bankruptcy court is affirmed. The Clerk of Court shall dismiss the appeal.

SO ORDERED:

---

4. In addition, to the extent appellants' argument on appeal turns on the materiality of Turbidy's alleged omissions, that was not in issue at trial. Indeed, as the bankruptcy court noted, "the materiality and valuation issues were severed at the Salsbergs' request." *Trico IV,* 374 B.R. at 539 n. 9. To the extent appellants argue that Trico was actually solvent at the time the reorganization plan was confirmed, appellants have waived this argument because they appeal only from the bankruptcy court's judgment after a trial limited to their own fraud claim.