Barbara J. WILSON, individually and as Trustee of and on behalf of the Barbara J. Wilson Trust, dated October 28, 1977, as amended and Joseph Gordon, Jr., Plaintiffs,

v.

**THORN ENERGY, LLC,**
**et al., Defendants.**

No. 08 Civ. 9009(FM).

United States District Court,
S.D. New York.

March 17, 2011.

Anne Baglivo Fitzpatrick, Rachel B. Adler, McDonald Law Group, LLC, New York, NY, for Plaintiffs.

Bradley Craig Rosen, Braden H. Farber, Esq., Mineola, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

FRANK MAAS, United States Magistrate Judge.

Plaintiffs Barbara J. Wilson ("Wilson"), Barbara J. Wilson Trust (the "Wilson Trust"), and Joseph Gordon, Jr. ("Gordon") (collectively, "Plaintiffs") made a loan to, and certain investments in, several limited liability companies for the purpose of exploring offshore oil reserves in the Republic of Liberia. In this diversity action, Plaintiffs seek to hold those companies, Thorn Energy, LLC ("Thorn"), Sonjtech Industries, LLC ("Sonjtech"), and Diaco Energy, LLC ("Diaco") (the "Defendant Entities"), as well as their Managing Member Charles Huggins ("Huggins") (collectively, the "Defendants"), liable to repay nearly $1 million, consisting of the outstanding loan balance, the monies Plaintiffs invested in the Defendant Entities, and prejudgment interest. Plaintiffs further seek to impose personal liability on Huggins for the Defendant Entities' obligations.

Following the close of discovery, Plaintiffs have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] (ECF No. 30). For the reasons set forth below, that motion is granted in part and denied in part.

## I. Background

Unless otherwise noted, the following facts are either undisputed or set forth in the light most favorable to Defendants.

### A. Parties

Wilson is a citizen of Michigan and the Trustee of the Wilson Trust, which is a living trust created under Michigan law. Gordon is a citizen of Ohio. (ECF No. 1 ("Compl.") ¶¶ 1–3).

The Defendant Entities are limited liability companies ("LLCs") organized under Delaware law which share the same address in New York City. At all relevant times, Huggins, a citizen of New York, represented himself to be the Managing Member of the Defendant Entities. Huggins also used the same New York address as the Defendant Entities. (ECF No. 32 ("Pls.' 56.1 Stmt.") ¶¶ 1–4; ECF No. 38 ("Defs.' 56.1 Stmt.") ¶¶ 1–4).

### B. Thorn's Activities in Liberia

Thorn was "organized for the purpose of exploring petroleum reserves off the coast of The Republic of Liberia, West Africa." (Aff. of Anne Fitzpatrick, Esq., sworn to Aug. 27, 2010, Ex. B at 1).[2] In April 2005, Thorn obtained from the National Oil Company of Liberia ("NOCAL") the rights to two offshore petroleum reserves, designated as Blocks 1 and 2 (the "Blocks"). Thorn and NOCAL memorialized that transaction in two memoranda of understanding ("MOUs"), one for each Block. (Aff. of Bradley Rosen, Esq., dated Oct. 20, 2010, Ex. 1).[3]

Thorn's investment strategy was to "'flip' or transfer most of the ownership" in the Blocks to a "Joint Venture Partner." (Ex. B at 1). Thorn envisioned that a

---

1. The motion is before me pursuant to the parties' previous consent to my exercise of jurisdiction over this case for all purposes pursuant to 28 U.S.C. § 636(c). (*See* ECF No. 24).

2. Any further references to lettered exhibits refer to the exhibits to the Fitzpatrick affidavit.

3. Any further references to numbered exhibits refer to the exhibits to the Rosen affidavit.

large oil company, such as Mobil, Chevron, or the South Korean National Oil Company, would serve as the Joint Venture Partner. (*Id.*). The MOUs set a deadline for Thorn to obtain certain seismic data for the Blocks which had been collected by a third party.[4] The MOUs further required that, by a date certain, Thorn provide NOCAL with a letter from an "internationally reputable and renowned [o]il [c]ompany" ("IOC"), acknowledging that the IOC and Thorn had begun "good faith negotiations" regarding a joint venture to explore and develop the Blocks. (Ex. 1). Both deadlines, however, could be extended at Thorn's request. (Ex. A ("Huggins Dep.") at 134).

Huggins planned to use his contacts in Africa to persuade an IOC to enter into a joint venture with Thorn. Huggins' contacts were government officials in Equatorial Guinea who had a "very close" relationship with Mobil. The officials offered to "walk" him through to "top" people at Mobil, but a lack of capital prevented Huggins from following through on the offer. (*Id.* at 138). As a consequence, after entering into the MOUs with NOCAL, Thorn took no further steps to explore and develop the Blocks. (*Id.* at 25, 36, 138–39).

## C. *Plaintiffs' Loans and Investments*

In or around May 2005, representatives of Thorn approached Wilson regarding "a proposed investment in Thorn." As part of these discussions, Wilson received a document entitled "Investment Ownership Structure for Thorn Energy, LLC" ("Initial Solicitation"). (Pls.' 56.1 Stmt. ¶¶ 5–6; Defs.' 56.1 Stmt. ¶¶ 5–6). The Initial Solicitation described Huggins as the "Manag-

er" of Thorn and stated that Thorn was formed for the purpose of exploring offshore petroleum reserves in Liberia. The Initial Solicitation further outlined Thorn's investment strategy of purchasing rights to the Blocks and subsequently "flipping" or transferring an ownership interest to an IOC, with Thorn receiving revenues from the minority ownership interest it retained. (Ex. B; Defs.' 56.1 Stmt. ¶ 6).

On May 18, 2005, Wilson and Thorn signed the Initial Solicitation.[5] (Pls.' 56.1 Stmt. ¶ 7; Defs.' 56.1 Stmt. ¶ 7). Both before and after that date, Wilson made several payments to Thorn and Huggins. First, on or about May 2, 2005, Wilson, as Trustee of the Wilson Trust, "loaned to Thorn and Huggins through Sonjtech, the sum of $350,000." (Pls.' 56.1 Stmt. ¶ 8; Defs.' 56.1 Stmt. ¶ 8). In connection with this loan, Sonjtech/Thorn executed and delivered a promissory note to Wilson (the "May 2005 Note"), which bore an interest rate of eleven percent per annum and required full repayment "in one calendar year." (Ex. C).

That same day, Wilson "made an additional payment to Thorn and Huggins through Sonjtech in the amount of $150,000" as an investment. (Pls.' 56.1 Stmt. ¶ 10; Defs.' 56.1 Stmt. ¶ 10). Thorn, in turn, executed an acknowledgment (the "May 2, 2005 Acknowledgment"), which stated that the $150,000 investment was to be "made to the account of Sonjtech Industries LLC at the Direction of Mr. Huggins." The May 2, 2005 Acknowledgment further provided that the payment "shall be deemed as made to Thorn Energy, LLC and shall have the same force and effect as if made directly to Thorn Energy,

---

4. Thorn was required to license that seismic data from a company called TGS–NOPEC, which had gathered the data pursuant to an agreement with NOCAL. (*See* Ex. 1).

5. In March 2006, certain portions of the Initial Solicitation were replaced by a "corrected copy" of that document ("Second Solicitation"). (Ex. K; Pls.' 56.1 Stmt. ¶ 20; Defs.' 56.1 Stmt. ¶ 20).

LLC in connection with MOU with [NO-CAL] ... for Block 1 in the Republic of Liberia." Nellie Varner signed the May 2, 2005 Acknowledgment on behalf of Huggins as the Managing Member of Thorn and Sonjtech. (Pls.' 56.1 Stmt. ¶ 11; Defs.' 56.1 Stmt. ¶ 11).

Approximately two weeks later, on or about May 16, 2005, Wilson made a second investment in Thorn in the amount of $350,000 in the form of a payment to "Thorn and Huggins through Sonjtech." In connection with this investment, Sonjtech/Thorn executed an acknowledgment (the "May 16, 2005 Acknowledgment"), which provided that "any payments made to Sonjtech ... shall be deemed as made to Thorn Energy LLC in connection with the [MOU] dated April 1, 2005, with [NO-CAL] for the purpose of petroleum exploration in Block 2 in the Republic of Liberia." Varner signed the May 16, 2005 Acknowledgment on behalf of Huggins as the Managing Member of Thorn and Sonjtech. (Pls.' 56.1 Stmt. ¶¶ 12–13; Defs.' 56.1 Stmt. ¶¶ 12–13).

Thus, as of May 16, 2005, "Wilson had made payments to Thorn and Huggins through Sonjtech totaling $850,000." (Pls.' 56.1 Stmt. ¶ 14). These funds were not given to Huggins as an individual, but, rather, in his capacity as "managing director" of Thorn and Sonjtech. (Defs.' 56.1 Stmt. ¶ 14). Of the $850,000, $350,000 constituted a loan governed by the terms of the May 2005 Note; the remaining $500,000 was an investment (*Id.*; Pls.' 56.1 Stmt ¶ 14).

In September 2005, Wilson received copies of the Thorn MOUs with NOCAL referenced in the May 2, 2005 Acknowl-

edgment and the May 16, 2005 Acknowledgment. Bradley Rosen, Esq., as "counsel for Thorn Energy, LLC," provided Wilson with those MOUs after Wilson signed a confidentiality agreement at his request.[6] (Pls.' 56.1 Stmt. ¶ 15–16; Defs.' 56.1 Stmt. ¶¶ 15–16).

### D. *Replacement of and Extensions to the May 2005 Note*

On or about February 27, 2006, Sonjtech/Thorn executed and delivered to Wilson a promissory note in the amount of $181,960 to replace the May 2005 Note ("Replacement Note"). (Pls.' 56.1 Stmt. ¶ 17; Defs.' 56.1 Stmt. ¶ 17). The Replacement Note had the same repayment terms as the May 2005 Note, but it converted $200,000 of Wilson's original loan into an equity investment in Block 1.[7] (Ex. H; Defs.' 56.1 Stmt. ¶ 17). Half of the converted equity was attributed to Wilson as "investor," while the other half was attributed to Gordon as "investor." (Exs. I, J). To evidence this change, Sonjtech/Thorn issued two acknowledgments memorializing Wilson's and Gordon's investments of $100,000 each (the "February 27, 2006 Acknowledgments"). Varner signed the February 27, 2006 Acknowledgments on behalf of Huggins as Managing Member of Sonjtech and Thorn. The February 27, 2006 Acknowledgments further provided that the payments were to be credited to Sonjtech's account. (Pls.' 56.1 Stmt. ¶¶ 18–19; Defs.' 56.1 Stmt. ¶¶ 18–19).

On or about May 5, 2006, Sonjtech/Thorn executed an "Extension to Replacement Promissory Note" in favor of

---

6. Rosen also serves as Defendants' counsel in this lawsuit. (*See* ECF No. 8). Despite his involvement in certain of the transactions giving rise to this suit, Plaintiffs have not sought to have him disqualified.

7. As a consequence, the principal amount of the loan was reduced to $150,000. The remaining $31,960 was interest accumulated on the May 2005 Note. (Ex. H).

Wilson and/or the Wilson Trust ("Note Extension"). The Note Extension extended the maturity date of the Replacement Note to December 31, 2006. (Ex. M; Pls.' 56.1 Stmt. ¶ 22; Defs.' 56.1 Stmt. ¶ 22). Shortly thereafter, on June 16, 2006, Wilson received a document captioned "Limited Liability Company Operating Agreement for Thorn" ("Thorn Agreement"), dated "as of May 1, 2005." [8] (Pls.' 56.1 Stmt. ¶ 23; Defs.' 56.1 Stmt. ¶ 23).

The loan evidenced by the Replacement Note was not repaid on time. Instead, on January 15, 2007, Sonjtech/Thorn executed a "Second Extension to Replacement Promissory Note" in favor of Wilson ("Second Extension"). The Second Extension extended the maturity date of the Replacement Note to April 30, 2007, and provided that interest at a rate of eleven percent per annum would continue to accrue until the Replacement Note was repaid in full. As of January 15, 2007, the amount outstanding under the Replacement Note was $195,944. (*See* Ex. O; Pls.' 56.1 Stmt. ¶¶ 24–25; Defs.' 56.1 Stmt. ¶¶ 24–25).

The May 2005 Note, Replacement Note, Note Extension, and Second Extension are collectively referred to hereinafter as the "Note."

### E. *Plaintiffs' Demands for Repayment Under the Note*

On June 7, 2007, Wilson received a $50,000 check drawn on a Diaco account as a partial repayment of the amount outstanding on the Note. (Ex. P; Pls.' 56.1 Stmt. ¶ 26; Defs.' 56.1 Stmt. ¶ 26). Since then, none of the Defendants has made any further payments to Plaintiffs. (Pls.' 56.1 Stmt. ¶ 27; Defs.' 56.1 Stmt. ¶ 27).

Wilson has made several subsequent demands to Defendants for repayment of the Note and "an accounting with respect to, or the return of, all other sums provided to the Defendants by Plaintiffs in connection with the Thorn investment solicitations." (Pls.' 56.1 Stmt. ¶ 27; Defs.' 56.1 Stmt. ¶ 27). Despite these demands, Plaintiffs have yet to be paid. As of August 26, 2010, the total amount due on the Note was $209,118.62, consisting of principal in the amount of $154,399.34 and interest in the amount of $54,719.28. Interest on the unpaid principal balance under the Note continues to accrue at the rate of eleven percent per annum, or $46.53 per day. (Pls.' 56.1 Stmt. ¶ 28; Defs.' 56.1 Stmt. ¶ 28).

### F. *Huggins' Testimony*

At his deposition, Huggins testified that he did not go very far in school, having never received even an elementary school degree. (Huggins Dep. at 13). As a result, he left certain business aspects of his ventures to individuals who were "smarter" and "wiser" than he was and who possessed the "right degrees." (*Id.* at 34–35).

Huggins' testimony thereafter focused on Thorn's investment strategy and the use of its investors' funds in Liberia. Huggins testified that he did not know the total amount of money that had been invested in the Defendant Entities, but believed it to be over one million dollars. (*Id.* at 29). Huggins also was unable to recall how much money was required to obtain the MOUs with NOCAL, explaining that the Liberian government's rules and personnel changed frequently. (*Id.* at 91–92). Huggins could not track the use of each investor's funds, in part because cash

---

**8.** The Thorn Agreement identified Thorn's eight members, who included Huggins, Wilson, and Gordon. (Ex. N at 4).

transactions are prevalent in Africa. (*Id.* at 191). He conceded that he spent the money that was available, however, on travel and business entertainment expenses and payments to consultants. (*Id.* at 68, 150, 191). Huggins used the term "consultant" loosely to refer to anyone who could provide information about, or assistance in obtaining, the MOUs, or who stood in the way of that goal. (*See id.* at 104 (sometimes in Africa "you have to pay people to get out of the way, that's the way it works"), 150 ("what I call consultants is everyone I come across," such as drivers and domestic staff who overhear information from their employers regarding the Blocks)).

Initially, Huggins testified that he was unaware of the details of the next steps that he and the Defendant Entities would have had to take to exploit the investment had it been sufficiently funded. (*Id.* at 24 ("if we were successful in getting the [MOUs], which we got, ... then there is other steps you would make, which we never made ..., so I can't speak to them, because we never made those other steps")). Later, however, Huggins described those further steps, but emphasized that funds ran out before any strategy beyond obtaining the MOUs could be implemented. (*See id.* at 46 ("We got the Blocks, but we didn't have the money to take it to the next step.")). As he explained, after obtaining the MOUs with NOCAL, the next step would have been to purchase the seismic data for the Blocks from TGS–NOPEC, who were the "experts." (*Id.* at 109, 132). Following that, he would have set up meetings with large oil companies, such as Mobil and Chevron, with the goal of having those companies "take over" the Blocks. (*Id.* at 49, 132–33).

During his deposition, Huggins also testified that he used money from several sources to pay for the rights to the Blocks and his expenses in Africa:

Q: So the money was invested and money was placed in accounts that were created, and the entities were Sonjtech, Diaco and Thorn to the best of your knowledge?

A: You know what, it's money for this deal came from Thorn, came from those accounts, and I can assure it came from other places as well. Okay. It had nothing to do with that. My money, whatever money I had, whatever I needed to do, I did it.

Q: So all the money was just put together and used towards whatever you needed to spend it on for this investment?

A: As I said, I was juggling. Whatever money I needed, if I could get it from here, get it from there, I got it to complete the mission.

(*Id.* at 189–90).

Similarly, in the course of explaining why the partial loan repayment to Wilson was made from a Diaco account, Huggins testified that Wilson "was desperate and we were desperate.... [S]o if it was there and she needed it and it was allocated for something else, and she needed it really bad, and that's why she got it. We were taking it from anywhere." (*Id.* at 171).

Huggins was not generally involved with the formation of the Defendant Entities. (*Id.* at 61–62). He nevertheless understood that the Defendant Entities were formed so that a company, rather an individual, could enter into the MOUs with NOCAL to obtain rights to the Blocks. (*Id.* at 123; *see also id.* at 31 ("there was a company [to own the rights to the Blocks]—it wasn't personally, I do know that")). Despite that structure, however, the Defendant Entities "didn't do any-

thing" in relation to the proposed venture. (*Id.* at 123 ("Sonjtech didn't do anything, neither did Thorn do anything. I did everything. Me.")).

### G. *Relevant Procedural History*

During discovery in this action, Defendants failed to produce an accounting of Plaintiffs' funds, in violation of several "so-ordered" deadlines. (*See* ECF No. 26; 2010 WL 1712236). Defendants attributed their failure to deliver the accounting to the malfunction of a computer flash drive that allegedly contained all of the relevant data. They further maintained that the flash drive malfunctioned and was discarded prior to the issuance of the Court's directives concerning discovery. (2010 WL 1712236, at *1–2).

On March 15, 2010, I granted Plaintiffs' motion for sanctions pursuant to Federal Rule of Civil Procedure 37(b) because Defendants had "violated this Court's orders by failing to preserve and produce in a timely manner relevant financial records in their custody or control." (*Id.* at *4). I further directed that Defendants be "precluded from offering any evidence at trial concerning their financial records or the data allegedly contained on the flash drive" that was discarded. (*Id.* (emphasis added)). Defendants incorrectly interpret this order to preclude them merely from "offering evidence of financial records that were on a flash drive that had malfunctioned." (Defs.' 56.1 Stmt. ¶ 29). In any event, even if the order were that narrow, Defendants' papers opposing Plaintiffs' summary judgment motion do not contain any financial documents or records.

## II. *Discussion*

### A. *Applicable Law*

#### 1. *Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact" based on supporting materials in the record. Fed.R.Civ.P. 56.

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 78 (2d Cir.2002); *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. *See Beyer v. Cnty. of Nassau*, 524 F.3d 160, 164 (2d Cir.2008). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. *Fischl*, 128 F.3d at 55; *see also* Fed. R.Civ.P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl*, 128 F.3d at 55.

To defeat a motion for summary judgment, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### 2. *Fraud*

Under New York law, the elements of a fraud claim are "[i] a material

misrepresentation or omission of fact [ii] made by defendant with knowledge of its falsity [iii] and intent to defraud; [iv] reasonable reliance on the part of the plaintiff; and [v] resulting damage to the plaintiff." [9] *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir.2006). In a fraudulent inducement claim, which is a particular species of fraud, a plaintiff may establish the second element of a fraud claim by showing that the defendant knew that the representation was untrue or made it with reckless disregard for the truth. *Langenberg v. Sofair*, No. 03 Civ. 8339(KMK)(FM), 2006 WL 3518197, at *4 (S.D.N.Y. Dec. 7, 2006); *see also In re Trico Marine Servs.*, 382 B.R. 201, 210 (S.D.N.Y.2008) ("liability lies for fraud under New York law only for statements known by defendant to be untrue or recklessly made") (internal quotation marks omitted).

### 3. Piercing the Veil of Limited Liability

■ Under New York's choice-of-law rules, the controlling law with respect to the Plaintiffs' veil piercing claim is the law of the state where the Defendant Entities were organized. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir.1995). All of the Defendant Entities were organized in Delaware. (*See* Pls.' 56.1 Stmt. ¶¶ 1–3; Defs.' 56.1 Stmt. ¶¶ 1–3). Therefore, Delaware law must be applied to this claim.

■ A plaintiff seeking to hold the owners of a corporation liable for the cor-

poration's debts "faces a difficult task." [10] *NetJets*, 537 F.3d at 176 (internal quotation marks omitted). "Under Delaware law, the corporate veil may be pierced 'in the interest of justice, when such matters as fraud, contravention of law or contract, [or] public wrong ... are involved.'" *S.J. Berwin & Co. v. Evergreen Entm't Grp., Inc.*, No. 92 Civ. 6209(WK), 1995 WL 606094, at *2 (S.D.N.Y. Oct. 12, 1995) (quoting *Pauley Petroleum Inc. v. Cont'l Oil Co.*, 43 Del.Ch. 516, 239 A.2d 629, 633 (1968)). Additionally, a court may impose personal liability on a corporation's owner when there is fraud or the corporation "is in fact a mere instrumentality or alter ego of its owner." *NetJets*, 537 F.3d at 176.

■ In *NetJets*, applying Delaware law, the Second Circuit distilled the standard for an alter-ego piercing claim into a two-pronged test which asks "(1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." *Id.* at 177. "[A] plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner." *Id.* at 176 (internal quotation marks omitted); *see also id.* at 177 (plaintiff is not required to show that the entity "was created with fraud or unfairness in mind;" rather, it is "sufficient to prove that it was so used").

■ A court's analysis of a veil-piercing claim should begin with "an examination of factors which reveal how the

9. The parties do not dispute that New York law applies to Plaintiffs' fraud claim. (*See* ECF No. 31 ("Pls.' Mem.") at 14 (citing New York law); ECF No. 37 ("Defs.' Mem.") at 10 (same)). Accordingly, the Court will apply New York law to this claim. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000) (parties' "implied consent" that New York law governs is "sufficient to establish choice of law") (internal quotation marks omitted).

10. Corporations and LLCs provide "similar liability shields" to their owners; accordingly, courts have found that the standard for disregarding the corporate form is applicable to piercing claims involving LLCs. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176, 178 (2d Cir.2008) (applying Delaware law).

corporation operates and the particular defendant's relationship to that operation." *Id.* at 176–77 (internal quotation marks omitted). To that end, the court should consider:

> whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*S.J. Berwin,* 1995 WL 606094, at *2 (quoting *United States v. Golden Acres, Inc.* 702 F.Supp. 1097, 1104 (D.Del.1988)). None of these factors is, by itself, sufficient to "justify a decision to disregard the corporate entity." *Golden Acres,* 702 F.Supp. at 1104. Thus, "some combination of them [is] required" and "an overall element of injustice or unfairness must always be present, as well." *Id.*

### B. *Application of Law to Facts*

#### 1. *Thorn's and Sonjtech's Liability on the Note*

The parties do not dispute that Thorn and Sonjtech are liable to Wilson and the Wilson Trust for the amounts outstanding under the Note. (Pls.' Mem. at 12–13; Defs.' Mem. at 9–10). Plaintiffs are therefore entitled to partial summary judgment against Thorn and Sonjtech in the amount of $209,118.62, plus interest at the rate of $46.53 per day for the period after August 26, 2010. *See Levien v. Allen,* 52 A.D.3d 578, 860 N.Y.S.2d 174, 175 (2d Dep't 2008) (affirming award of judgment to plaintiff because defendant failed to present affirmative defenses or controvert plaintiff's *prima facie* case that defendant defaulted on promissory notes).

#### 2. *Fraud Claim*

Defendants' alleged investment strategy was to obtain rights to offshore oil reserves in Liberia and subsequently to "flip" the lion's share of them to a larger oil company. (Pls.' 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. ¶ 6; *see* Exs. B, K). Although Plaintiffs have not submitted any sworn statements establishing the reliance element of their fraud claim, it seems obvious that they would not have made the investments and loans that they did unless Defendants represented that this was their strategy. Accordingly, Defendant's representations concerning their investment strategy were material and reasonably relied upon by Plaintiffs. It also is clear that Plaintiffs have been injured as a result of their reliance on those representations.

The remaining issue is whether Plaintiffs have shown that Defendants made the representations to them with actual knowledge of their falsity or reckless indifference to the truth. Plaintiffs contend, in that regard, that Defendants' representations in the Initial and Second Solicitations ("Solicitations") concerning their investment strategy were not true because (a) Defendants did not have an actual investment strategy in place, (b) Defendants did not use Plaintiffs' funds to further the investment, and (c) Huggins was ignorant with respect to the capitalization of the investment.

Turning to the first of these theories, Plaintiffs contend that there was no *actual* investment strategy in place because Huggins "never had any idea of how obtaining the alleged oil blocks would provide any return on an investment." (Pls.' Mem. at 13–14). It is true that Huggins' testimony confirmed certain gaps in his knowledge regarding the investment strategy, (*see* Huggins Dep. at 24 ("I can't speak to [the next steps after obtaining the MOUs], be-

cause we never made those other steps")). Nevertheless, Huggins demonstrated that he was in fact aware of the overall alleged strategy for realizing a profit from the Blocks. For example, he repeatedly stated at his deposition that the next steps, after signing the MOUs with NOCAL, would have been to obtain the seismic data and to meet with an IOC to discuss transferring Defendants' rights in the Blocks. (*Id.* at 49, 132–33; *see also id.* at 51 (based on the "contracts drafted, we would own those blocks and we would participate in the revenue from those blocks")).

Indeed, Huggins' description of Defendants' next steps is consistent with the investment strategy outlined in the Solicitations. (*See* Exs. B, K). The Solicitations stated that Thorn planned to establish a joint venture with an IOC such as Mobil or Chevron. (*Id.*). Although Defendants admittedly did not follow through with this strategy due to a lack of funds, it appears that Huggins successfully completed the first step of the process by obtaining the MOUs for the Blocks. (*See* Ex. 1 (MOUs dated Apr. 1, 2005, for Blocks 1 and 2, signed by Huggins, as authorized representative of Thorn, and Jacob T. Kabakole, Executive Vice President, NOCAL)).

From this evidence, a trier of fact could reasonably conclude that, contrary to Plaintiffs' contention, Defendants in fact had an actual investment strategy which was consistent with the Solicitations, and that the representations in the Solicitations therefore were not untrue when they were made. Plaintiffs therefore are not entitled to summary judgment on the fraud claim on the theory that Defendants knew the representations in their Solicitations were false.

Plaintiffs' second fraud theory is based on Defendants' alleged failure to use the invested funds for their stated purpose. (*See* Pls.' Mem. at 14–15). At his deposition, Huggins testified that the invested funds were spent on living and business entertainment expenses and consultants costs, with the objective of obtaining MOUs for the Blocks. (*See* Huggins Dep. at 68, 149–50). Huggins further testified that business in Africa is conducted in a manner quite different from the United States, and that he therefore had to pay individuals who typically would not be considered consultants in this country. (*See id.* at 150 (describing payments to "consultants" such as drivers and domestic staff who allegedly had relevant information about the Blocks)).

Plaintiff's misuse-of-funds fraud theory is predicated on Huggins' failure to hire more conventional consultants, such as geologists, to review the seismic data for the Blocks. (*See* Pl.'s Mem. at 14). Despite Plaintiffs' second guessing of Huggins' expenditures, however, Huggins testified that Plaintiffs' funds were in fact used to obtain the MOUs. (*See id.* at 189 ("[T]he money was there to be used to get the Blocks, which I got.")). Moreover, Plaintiffs have not adduced any evidence that their money was used for any purpose other than obtaining the rights to the Blocks and related travel, business entertainment, and consulting costs and expenses. Consequently, on the basis of the present record, a reasonable juror could find that Defendants used the invested funds in a manner consistent with their representations. While this outcome may be unlikely, it is not impossible. Summary judgment therefore cannot be granted on the theory that Defendants misrepresented the planned use of the funds.

Finally, Plaintiffs assert that Huggins' ignorance regarding the total capitalization of the investment warrants a finding that the financial information in the Solicitations was false. (ECF No. 39 ("Pls.' Re-

ply") at 1–2). Here again, while Defendants' explanations regarding their use of Plaintiffs' funds may stretch credulity, a trier of fact could find that reasons other than Huggins' alleged fraudulent intent explain why he lacked knowledge about the financing of Defendants' venture. For example, due to his limited formal schooling, (see Huggins Dep. at 13), Huggins may not have been up to completing such tasks as crunching the numbers or tracking investor funds. Indeed, Huggins testified that his role was limited to going to Africa and obtaining the MOUs, while other individuals, who were "a lot smarter," "wiser," and had the "right degrees," would take the investment to the "next level." (Id. at 32, 34–35). In the absence of any showing that no such individuals were affiliated with the venture, the Court would have to engage in speculation to conclude on the basis of Huggins' testimony that the financial information in the Solicitations was false. This obviously would be improper.

In sum, while Plaintiffs may have a strong case, the Court cannot find as a matter of law that they were defrauded. Accordingly, because there are issues of material fact regarding the falsity or recklessness of Defendants' representations, Plaintiffs are not entitled to an award of summary judgment on their fraud claim.

### 3. *Huggins' Personal Liability*

 To hold Huggins personally liable for the obligations of the Defendant Entities, Plaintiffs must first show that Huggins and the Defendant Entities operated as a single economic unit. *See NetJets*, 537 F.3d at 177. Plaintiffs, however, have not adduced evidence sufficient to establish as a matter of law that the Defendant Entities' limited liability protections may be disregarded.

It is undisputed that Huggins had a significant relationship with all three Defendant Entities, having held himself out as the Managing Member of each of them. Huggins and the Defendant Entities also used the same address in New York City. (Pls.' 56.1 Stmt. ¶¶ 1–4; Defs.' 56.1 Stmt. ¶¶ 1–4).

Nevertheless, despite these ties, there clearly is a factual dispute as to whether Huggins siphoned off the Defendant Entities' funds for his personal use. Plaintiffs contend that the Defendant Entities' funds "were all intermingled and controlled by Huggins," based upon his testimony (quoted earlier) concerning the use of funds. (Pls.' Mem. at 18–19 (citing Huggins Dep. at 189–90)).

Huggins' testimony does not establish, as a matter of law, that he misapplied the Defendant Entities' funds for his own personal needs. Admittedly, his statement indicating that "[m]y money" was used to obtain the rights to the Blocks could be interpreted to mean that he treated the Defendant Entities' funds as his own. However, considered in the context of the rest of his testimony, Huggins' statement may simply have been a reference to funds that the Defendant Entities made available to him in Africa for purposes of acquiring the Blocks, without suggesting that those funds were available for him to use personally. Huggins' reference to "juggling" funds is similarly ambiguous. Thus, a juror could reasonably conclude that Huggins was referring to transfers of funds among the Defendant Entities' accounts, rather than transfers between those accounts and his own personal account (assuming he had one at the time). It follows that there is a material issue of fact as to whether Huggins improperly commingled funds.

Relying on Huggins' testimony that the Defendant Entities "didn't do anything" and that he "did everything," Plaintiffs further contend that the Defendant Enti-

ties were nothing more than a facade. (Pls.' Reply at 8 (citing Huggins Dep. at 123)). Here again, however, a reasonable juror could find that Huggins' statement referred to the fact that he alone—without the assistance of other members of the Defendant Entities—did all of the legwork in Africa to secure the rights to the Blocks. Indeed, at his deposition, Huggins acknowledged that there was a distinction between the activities of the Defendant Entities and those that he might have undertaken personally. Thus, in response to a question asking whether he personally owned the rights to the Blocks, Huggins responded, "there was a company—it wasn't personally, I do know that." (Huggins Dep. at 31). Huggins' testimony therefore does not provide a basis to conclude as a matter of law that he disregarded the LLC form and that the Defendant Entities were a mere instrumentality for his personal activities.

In sum, because there are disputed issues of material fact with respect to whether Huggins and the Defendant Entities operated as a single economic unit, summary judgment must be denied with respect to Plaintiffs' veil-piercing claim. It therefore is not necessary to address the second prong of the *NetJets* test, which asks whether there was an element of injustice or unfairness in the dealings between Plaintiffs and Defendants. *See NetJets,* 537 F.3d at 177.

### III. *Conclusion*

For the reasons set forth above, Plaintiffs are entitled to partial summary judgment against Thorn and Sonjtech with respect to their liability under the Note. Accordingly, Plaintiffs are entitled to recover from these defendants the sum of $209,118.62, plus interest from August 26, 2010, at the rate of $46.53 per diem. Plaintiffs' motion, (ECF No. 30), is denied,

however, with respect to their fraud claim and their effort to impose personal liability on Huggins for the obligations of the Defendant Entities.

A further telephone conference shall be held on April 1, 2011, at 10 a.m., to discuss the next steps in this case. Counsel for Plaintiffs should initiate that call.

SO ORDERED.